FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2019 MAY -9 P 4: 02

WILLIAM W. BLEVINS
CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**FELONY**

### SUPERSEDING BILL OF INFORMATION FOR FORCED LABOR CONSPIRACY, FORCED LABOR, AND MISPRISION OF A FELONY

| | | | | |
|---|---|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.:** | 18-160 | |
| v. | * | **SECTION:** | "J" | |
| **RAYLAINE KNOPE** | * | **VIOLATIONS:** | 18 U.S.C. § 371 | |
| | | | 18 U.S.C. § 1589 | |
| | * | | 18 U.S.C. § 4 | |

\* \* \*

The United States Attorney charges:

### COUNT ONE
(Conspiracy, Forced Labor)

**A.**   **AT ALL TIMES MATERIAL HEREIN:**

1. Defendant **RAYLAINE KNOPE (KNOPE)** was the wife of T.J.K.; the mother of B.L. and J.L., and the step-mother of T.K. D.P. was a relative of **KNOPE's**. D.P. has been diagnosed with disabilities, including autism. D.P. received federal Supplemental Security Income ("SSI") from the federal Social Security Administration ("SSA") because of her disabilities.

2. In August 2015, **KNOPE**, T.J.K., J.L., B.L., and T.K. lived in a house in Kentwood, Louisiana. D.P. and D.P.'s mother lived with them.

__ Fee __USK__
_D_ Process_____
_X_ Dktd_____
__ CtRmDep_____
__ Doc. No._____

3. On August 12, 2015, D.P.'s mother died. A short time later, **KNOPE**, T.J.K., J.L., and T.K. moved to a mobile home located on Rushing Lane in Amite, Louisiana ("the Rushing Lane property"), taking D.P. with them. B.L. periodically lived at the Rushing Lane property.

4. On or about August 13, 2015, T.J.K. applied to be representative payee for D.P.'s SSI benefits. As D.P.'s representative payee, T.J.K. was required by the SSI program to spend all of the benefits he received on D.P.'s behalf only for D.P.'s living expenses.

## B. THE CONSPIRACY:

Beginning on or about August 13, 2015, and continuing through on or about June 30, 2016, within the Eastern District of Louisiana and elsewhere, the defendant, **RAYLAINE KNOPE**, conspired, combined, and agreed with others known and unknown to the United States Attorney, including T.J.K., J.L., B.L., and T.K., to knowingly violate 18 U.S.C. § 1589. Specifically, the defendants conspired, combined, and agreed to knowingly provide and obtain the labor and services of D.P. by means of force, threats of force, physical restraint, and threats of physical restraint to D.P.; by means of serious harm and threats of serious harm to D.P.; by means of the abuse and threatened abuse of law and legal process; and by means of a scheme, plan, and pattern intended to cause D.P. to believe that if D.P. did not perform such labor and services, D.P. would suffer serious harm and physical restraint.

## C. MANNER AND MEANS OF THE CONSPIRACY:

It was a part of the plan and purpose of this conspiracy that defendant **KNOPE**, T.J.K., J.L., B.L., and T.K. (collectively, "the family") forced D.P. to perform household work and yard work for the family at the Rushing Lane property. The plan of the conspiracy was for the co-conspirators to subject D.P. to physical restraint, consistent physical violence, threats of physical violence, psychological and verbal abuse, abuse of legal process, and psychological manipulation

to obtain uncompensated household labor and services from D.P. As the conspiracy progressed, the family physically restrained D.P. by locking her in a backyard tent, a backyard shed, and later in a backyard cage to maintain control over her and to prevent her from escaping.

**D.     OVERT ACTS:**

In furtherance of this conspiracy and to effect the objects thereof, defendant **KNOPE** and her co-conspirators committed the following overt acts, among others, in the Eastern District of Louisiana:

1. At the Rushing Lane Property, although D.P. was initially permitted to sleep on a mattress on the floor inside the family's mobile home, **KNOPE** soon thereafter ordered D.P. to sleep outside in the backyard.

2. In the backyard, the family required D.P. to live first in a camping tent, then in a shed, and, finally, in a cage.

3. While D.P. lived in the tent, to prevent D.P. from escaping from the Rushing Lane property, **KNOPE** ordered T.K., J.L., and others to lock D.P. into the tent at night. While D.P. lived in the shed and in the cage, to prevent D.P. from escaping from the Rushing Lane property, **KNOPE** and T.J.K. ordered T.K., J.L., and others to lock D.P. into those structures.

4. Throughout the time D.P. lived at the Rushing Lane property, the family required D.P. to complete housework and yard work in exchange for food and water. The family did not pay D.P. for any of her work. Each day, the family required D.P. to clean up the yard.

5. At times, the family also required D.P. to clean the bathroom in the mobile home, clean the mobile home's kitchen, and wash the family's dishes, among other tasks.

6. Throughout the time D.P. lived at the Rushing Lane property, the family forced D.P. to eat lesser quality food than the rest of the family.

7. When D.P. did not complete her work to **KNOPE's** or T.J.K.'s liking, or when D.P. did not complete the work quickly enough, **KNOPE** and T.J.K. denied D.P. food.

8. Throughout the time D.P. lived at the Rushing Lane property, when D.P. did not complete her housework or yardwork to **KNOPE's** or T.J.K.'s liking, members of the family physically assaulted D.P. T.J.K. choked and kicked D.P. and **KNOPE** threw canned goods at D.P. for this reason.

9. On several occasions, the family forced D.P. to do housework in a demeaning fashion. **KNOPE** and T.J.K. forced D.P. to clean the kitchen and walls with a toothbrush.

10. **KNOPE** and T.J.K. required D.P. to cut the grass in the yard using scissors.

11. In the spring of 2016, at **KNOPE's** and T.J.K.'s direction, T.J.K. and J.L., with the help of others (including one of **KNOPE's** minor children), built a cage for D.P. in the backyard of the Rushing Lane property. The cage consisted of a disused animal pen made out of chicken wire. A plastic tarp was placed over the top of the cage. J.L. cut tree branches and placed them over the tarp to hide the cage from sight. The family put a tent and a single bare mattress inside the cage. The family also put a five-gallon bucket in the cage for D.P. to use as a toilet.

12. Once the cage was complete, **KNOPE** and T.J.K. required D.P. to live in the cage.

13. Members of the family routinely physically assaulted D.P., causing D.P. physical injuries. On one occasion, after **KNOPE** stated to B.L. that D.P. should be punished, B.L. struck D.P. over the head with a wooden board, causing D.P. to bleed from her head such that blood dripped onto D.P.'s shirt and onto the floor.

14. After the assault described in paragraph 13, the family refused to provide D.P. with professional medical care because the family did not want anyone to know that they were abusing D.P. Instead, one of the family members used glue to close D.P.'s wound.

15. On another occasion, B.L. held D.P.'s arm while T.J.K. burned D.P. with a cigarette lighter by placing the flame directly on D.P.'s hand. While being burned, D.P. cried, stated that the flame was causing her pain, and attempted to pull her arm away from the flame, but B.L. held D.P.'s arm in place preventing D.P. from escaping the flame. As he burned D.P., T.J.K. told D.P. that she was being punished for talking back to **KNOPE**.

16. On another occasion, T.J.K. shot D.P. with a BB gun at close range because of D.P.'s disability, while telling D.P. she was a "retard" who "deserved to die."

17. On at least one occasion, **KNOPE** and T.J.K. hit D.P. with a wooden paddle.

18. On at least one occasion, T.J.K. punched D.P. in the head with his fist.

19. On at least one occasion, at **KNOPE's** direction, **KNOPE's** minor children kicked and punched D.P. while telling D.P. that she was dumber than they were.

20. T.K., at **KNOPE's** direction, held D.P's head underwater in a bathtub as D.P. struggled to come up for air.

21. **KNOPE**, J.L., T.J.K., and B.L. routinely threatened D.P. These threats included, among other things, threats to shoot D.P. if she ever tried to escape the Rushing Lane property, threats to beat D.P. if she disobeyed the family's orders, and threats to kill D.P. if she ever reported the family to law enforcement.

22. J.L. threatened to cut D.P.'s throat if she ever spoke to law enforcement about her abuse by the family.

23. **KNOPE** threatened to shoot D.P. if she ever tried to escape from the Rushing Lane property.

24. Each member of the family, including **KNOPE**, routinely verbally and psychologically abused D.P. The family routinely called D.P. "stupid" and "retarded" in reference

5

to D.P.'s disability. **KNOPE** said, in reference to D.P., "This retarded girl will do anything you say."

25. On one occasion, **KNOPE** forced D.P. to open an urn containing D.P.'s deceased mother's ashes, pour the ashes into a bowl with milk, and eat the ashes with a spoon. The family, including **KNOPE**, watched and laughed at D.P. as she did so. D.P. vomited onto the table several minutes after consuming the ashes.

26. On another occasion, T.J.K. and J.L. filled a bucket with urine and feces from the family's septic tank and threw the human waste at D.P. D.P., who was covered from head to toe with the urine and feces, began screaming while J.L. laughed. J.L. then sprayed D.P. with water from an outdoor hose to clean her off. The family did not allow D.P. to shower or use soap to clean off the human waste.

27. The family forced D.P. to lick soiled underwear.

28. The family forced D.P. to eat dog feces placed on bread.

29. J.L. and **KNOPE** forced D.P. to simulate sexual acts with a jalapeño pepper.

30. More than once, J.L. and **KNOPE** forced D.P. to make sexual advances toward male visitors to the Rushing Lane property.

31. Throughout the time D.P. lived at the Rushing Lane property, **KNOPE** and T.J.K. manipulated the legal process to advance the conspiracy by forcing D.P. to use methamphetamine and prescription painkillers, then threatening to turn D.P. into the police for using drugs if D.P. did not obey the family's orders.

32. **KNOPE** and T.J.K. prevented D.P. from keeping possession of any state identification, money, or means of communication, so as to prevent D.P. from escaping the family's control or contacting law enforcement.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### (Forced Labor)

A.  The allegations in Count One of this Superseding Bill of Information are re-alleged and incorporated by reference as though fully set forth herein.

B.  Beginning on or about August 12, 2015, and continuing through on or about June 30, 2016, within the Eastern District of Louisiana and elsewhere, the defendant, **RAYLAINE KNOPE**, did knowingly provide and obtain the labor and services of D.P. by any one of, and any combination of, the following means:

(1) force, threats of force, physical restraint, and threats of physical restraint to D.P.;

(2) serious harm and threats of serious harm to D.P.;

(3) abuse and threatened abuse of law and legal process; and

(4) any scheme, plan, and pattern intended to cause D.P. to believe that, if D.P. did not perform such labor and services, D.P. would suffer serious harm and physical restraint.

All in violation of Title 18, United States Code, Sections 1589(a) and (d).

## COUNT THREE
### (Misprision of a Felony)

A.  The allegations in Count One of this Superseding Bill of Information are re-alleged and incorporated by reference as though fully set forth herein.

B.  Beginning on or about August 15, 2015, and continuing through on or about June 30, 2016, within the Eastern District of Louisiana, the defendant **RAYLAINE KNOPE**, having knowledge of the actual commission of a felony cognizable by a court of the United States, did conceal the same from law enforcement and did not as soon as possible make the illegal activity known to a judge, agent, or other person in civil or military authority under the United States.

Specifically, the defendant knew that T.J.K. stole D.P.'s Supplemental Security Income benefits and used these funds for purposes other than to provide D.P. her basic living needs, in violation of 18 U.S.C. § 641, and the defendant took affirmative steps to conceal that fact and did not report the illegal activity to any law enforcement official.

All in violation of Title 18, United States Code, Section 4.

PETER G. STRASSER<br>
UNITED STATES ATTORNEY<br><br>
/s/ Julia K. Evans<br>
JULIA K. EVANS<br>
Assistant United States Attorney<br>
650 Poydras Street, Suite 1600<br>
New Orleans, Louisiana 70130<br><br>
/s/ Risa Berkower by jke<br>
RISA BERKOWER<br>
NICHOLAS REDDICK<br>
Trial Attorneys, Civil Rights Division<br>
United States Department of Justice

New Orleans, Louisiana
May 9, 2019

No. 18-160

# United States District Court
## FOR THE
### EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

*vs.*

RAYLAINE KNOPE

**SUPERSEDING BILL OF INFORMATION FOR FORCED LABOR CONSPIRACY, FORCED LABOR, AND MISPRISON OF A FELONY**

Violation(s): 18 U.S.C. § 371
18 U.S.C. § 1589
18 U.S.C. § 4

Filed _____, 20 19 , _____, *Clerk.*

By _____, *Deputy*

*Julia K. Evans*
*Assistant United States Attorney*
JULIA K. EVANS