UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO.: 18-160 |
| v. | * | SECTION: "J" |
| RAYLAINE KNOPE | * | |
| | * * * | |

## FACTUAL BASIS

The defendant, **RAYLAINE KNOPE** ("KNOPE"), agrees to plead guilty to Counts One, Two and Three of the Superseding Bill of Information.  Count One charges the defendant with Conspiracy, in violation of Title 18, United States Code, Section 371, for conspiring with members of her family to commit a violation of Title 18, United States Code, Section 1589 (Forced Labor). Count Two charges the defendant with Forced Labor, in violation of Title 18, United States Code, Section 1589.  Count Three charges the defendant with Misprision of a Felony, in violation of Title 18, United States Code, Section 4.  The defendant agrees that, if this matter were to go to trial, the government would prove the following facts beyond a reasonable doubt, and the defendant also agrees that the following facts are true and occurred within the Eastern District of Louisiana between on or about August 13, 2015 and June 30, 2016:

1.  In 2015, **KNOPE** lived with her husband, T.J.K., her daughter, B.L., her son, J.L., and her stepdaughter, T.K. (who is T.J.K.'s biological daughter), along with other family members (collectively, "the family").  Until late August 2015, the family lived together in a home in Kentwood, Louisiana ("the Kentwood home").  In August 2015, **KNOPE**, T.J.K., J.L., and T.K. moved to a property containing a mobile home on Rushing Lane in Amite, Louisiana ("the Rushing

Lane property"). B.L. did not live at the Rushing Lane property full-time, but, starting in August 2015, B.L. was regularly present at the property and lived there periodically.

2.  D.P. is a relative of **KNOPE's**. In 2015, D.P. and her mother came to live with the family in the Kentwood home. D.P. has been diagnosed with disabilities, including autism. Based on this diagnosis, D.P. received a government disability check (Supplemental Security Income or SSI benefits) from the U.S. Social Security Administration each month to pay for her living expenses. D.P.'s mother died on August 12, 2015. Shortly afterward, D.P. moved with **KNOPE**, T.J.K., J.L., and T.K. to the Rushing Lane property because D.P. had nowhere else to go. Also shortly after D.P.'s mother died, T.J.K. completed paperwork to become D.P.'s representative payee, which meant that he started receiving D.P.'s monthly government disability check on D.P.'s behalf.

3.  Throughout the time D.P. and the family lived at the Rushing Lane Property, **KNOPE**, T.J.K., J.L., B.L., and T.K. collectively subjected D.P. to consistent physical violence, threats of physical violence, physical restraint, threats of physical restraint, psychological and verbal abuse, abuse of legal process, and psychological manipulation in order to obtain uncompensated household labor and services from D.P. **KNOPE** was aware of this plan among her family members, knowingly agreed to participate in it, and engaged in acts both on her own and with other members of her family that advanced the plan's objective.

4.  Initially, at the Rushing Lane property, D.P. was permitted to sleep inside the family's mobile home. However, as part of the family's plan to obtain uncompensated household labor and services from D.P., the family physically restrained D.P. for several months in 2015 and 2016 in order to maintain control over her and to prevent her from escaping. After a few days of living inside the mobile home, D.P. was required to sleep in a camping tent in the backyard. At

**KNOPE's** direction, the family locked D.P. inside the tent at night with a small padlock that fastened the tent's zipper shut.

5. At some point while D.P. was living in the locked tent, the family installed portable sheds on the Rushing Lane property. **KNOPE** and T.J.K. ordered D.P. to live in one of these sheds. The shed did not have running water or electricity. The family gave D.P. a five-gallon bucket to use as a toilet while she was inside the shed. At night, at **KNOPE's** and T.J.K.'s direction, the family closed the door to the shed with a latch from the outside so that D.P. could not get out of the shed. After a time, at **KNOPE's** and T.J.K.'s direction, the family also locked the shed from the outside by threading a small padlock through the closed latch.

6. After D.P. lived in the shed for a time, T.J.K. became angry with D.P. for spilling water on the shed's floor, causing the floor to rot. At T.J.K. and **KNOPE's** direction, D.P. was again required to live in a locked tent in the backyard. This time, the tent was placed under an open wooden structure.

7. One day, several months prior to June 30, 2016, and during the time D.P. was living in the locked tent under the open wooden structure, T.J.K. and **KNOPE** discussed where to house D.P. at the Rushing Lane property. During this discussion, T.J.K. and **KNOPE** agreed that they would move D.P.'s tent into a locked backyard cage and force D.P. to live in a cage that was already located in the backyard and had previously been used to house animals.

8. Immediately after **KNOPE** and T.J.K. reached this decision, the family started preparing the cage for D.P. As part of this task, J.L., T.K. and other family members gathered branches and a tarp to put over the cage as camouflage. Once the cage was ready, T.J.K. and **KNOPE** then ordered D.P. into the cage. D.P. complied, and **KNOPE** locked the cage with a metal chain and padlock.

9. At T.J.K.'s and **KNOPE**'s direction, D.P. was forced to live in the cage for several months prior to June 30, 2016. Usually, T.K. locked D.P. into the cage at night and unlocked the cage in the morning. The cage did not have running water or electricity at any point in time. While inside, D.P. used a five-gallon bucket as a toilet.

10. The purpose and effect of the physical restraint described in paragraphs 4 through 9, above, was to prevent D.P. from escaping from the Rushing Lane property and to scare D.P. into continued compliance with the family's orders, including, among other things, housework and yard work. Throughout the time D.P. lived at the Rushing Lane property, **KNOPE** and other members of her family required D.P. to complete housework and yard work in exchange for food and water. Each day, D.P. was required to clean up the yard. At various times, at **KNOPE's** direction, D.P. was also required to clean the bathroom in the mobile home, clean the mobile home's kitchen, and wash the family's dishes, among other tasks. D.P. was not paid for any of her work. At **KNOPE's** and T.J.K.'s direction, D.P. was not permitted to eat the same food as the family; D.P. was required to eat food of lesser quality. Additionally, if D.P. did not complete her work to **KNOPE's** or T.J.K.'s liking, or if D.P. did not complete the work quickly enough, **KNOPE** and T.J.K. denied D.P. food. Because of this, D.P. lost a substantial amount of weight while living at the Rushing Lane property.

11. Throughout the time D.P. lived at the Rushing Lane property, if D.P. did not complete her housework or yardwork to **KNOPE's** or T.J.K.'s liking, D.P. would be physically assaulted. On more than one occasion, T.J.K. choked and kicked D.P. and **KNOPE** threw canned goods at D.P. for this reason.

12. On several occasions, **KNOPE** and members of her family forced D.P. to do housework in a demeaning fashion. Once, T.J.K. and **KNOPE** forced D.P. to clean the kitchen

4

and walls with a toothbrush. On one other occasion, T.J.K. and **KNOPE** required D.P. to cut the grass in the yard using scissors.

13. Throughout the time D.P. lived at the Rushing Lane property, each member of the family, including **KNOPE**, physically assaulted D.P. **KNOPE** knew the physical abuse of D.P. to be routine, saw this regular physical abuse, and knew that these assaults often caused D.P. physical injuries. On one occasion, after **KNOPE** complained to B.L. that D.P. should be punished, B.L. struck D.P. over the head with a wood board. The strike caused D.P. to bleed from her head such that blood dripped onto D.P.'s shirt and onto the floor. D.P. was not provided professional medical care because the family did not want anyone to know how they were treating D.P. Instead, one of the family members used glue to close the wound. On other occasions, KNOPE directed other family members to physically assault D.P. to punish D.P. **KNOPE** also knew of numerous instances in which other family members used physical violence against D.P. The purpose and effect of these physical assaults was to scare D.P. into continued compliance with the family's orders, including, among other things, housework and yard work.

14. Throughout the time D.P. lived at the Rushing Lane property, **KNOPE**, T.J.K., J.L., and B.L. threatened D.P. **KNOPE** knew the threats made to D.P. to be routine. On one occasion, **KNOPE** threatened to shoot D.P. if she ever tried to escape the Rushing Lane property. These threats also included, among other things, threats to beat D.P. if she disobeyed the family's orders, and threats to kill her if she ever reported the family to law enforcement. The purpose and effect of these threats was to scare D.P. into continued compliance with the family's orders, including, among other things, housework and yard work.

15. Throughout the time D.P. lived at the Rushing Lane property, each member of the family, including **KNOPE**, verbally and psychologically abused D.P. **KNOPE** knew the verbal

and psychological abuse of D.P. to be routine. The family regularly called D.P. "stupid," and "retarded," in reference to D.P.'s disability. **KNOPE** once said, in reference to D.P., "This retarded girl will do anything you say." On one occasion, **KNOPE** ordered D.P. to open an urn containing D.P.'s deceased mother's ashes, pour the ashes into a bowl with milk, and eat the ashes with a spoon. On other occasions, the family forced D.P. to lick soiled underwear and eat dog feces placed on bread. In addition, **KNOPE** and J.L. forced D.P. to simulate sexual acts with a jalapeño pepper and grab the genitals of male members in the household. The purpose and effect of this verbal and psychological abuse was to obtain D.P.'s continued compliance with the family's orders, including, among other things, housework and yard work.

16. Throughout the time D.P. lived at the Rushing Lane property, **KNOPE** and T.J.K. manipulated the legal process to advance the conspiracy. As an example, **KNOPE** and T.J.K. prevented D.P. from keeping possession of any state identification, money, or means of communication, so as to prevent D.P. from escaping their control or contacting law enforcement.

17. The conduct described in paragraphs 1 through 16, above, constituted a scheme, plan, and pattern intended to cause D.P. to believe that if she did not obey the orders given to her by **KNOPE** and **KNOPE**'s family members, she would suffer serious harm and physical restraint.

18. Beginning on or about August 13, 2015, and through June 30, 3016, **KNOPE** knew that T.J.K. became the representative payee for D.P.'s federal Supplemental Security Income ("SSI") disability benefits from the U.S. Social Security Administration, which D.P. received because of her disabilities. **KNOPE** also knew that, as the representative payee, T.J.K. was required to use these funds for D.P.'s living expenses, but that he instead stole the benefits. **KNOPE** knew that this was a violation of federal law, but she did not report it to any law enforcement authority. **KNOPE** also took affirmative steps to conceal this crime. Specifically,

when D.P. asked **KNOPE** and T.J.K. for access to her SSI benefits, **KNOPE** falsely told D.P. that SSI was no longer providing D.P. with those benefits. In fact, as **KNOPE** well knew, the benefits payments had not stopped, and instead T.J.K. was using D.P.'s stolen benefits to purchase items for himself and for **KNOPE**.

Both the government and the defendant, **RAYLAINE KNOPE**, do hereby stipulate and agree that the above facts are true, and that they set forth a sufficient factual basis for the crimes to which the defendant is pleading guilty.

_____  
RAYLAINE KNOPE        (Date)  
Defendant

_____  
JULIA K. EVANS    5/20/19   (Date)  
Assistant United States Attorney

_____  
STEVEN LEMOINE, ESQ.  5-20-19 (Date)  
Counsel for Defendant

_____  
RISA BERKOWER    5/20/19   (Date)  
NICHOLAS REDDICK  
Trial Attorneys  
Civil Rights Division  
U.S. Department of Justice